No. 83-65

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

RAY E. EHLY,

Plaintiff and Respondent,

vs.

DOROTHY V. CADY, BRUCE M. CADY,
and CASSANDRA JOANNE CADY,

Defendants and Appellants,

and

JAMES A. USSIN, d/b/a U BAR S REAL ESTATE,

Defendant, Cross-Claimant, and Respondent.

---

Appeal from:   District Court of the Fourteenth Judicial District
               In and for the County of Meagher
               Honorable Nat Allen, Judge presiding.

Counsel of Record:

        For Appellants:

            Hooks and Budewitz, Townsend, Montana
            Patrick F. Hooks argued, Townsend, Montana
            Moore, Rice, O'Connell & Refling, Bozeman, Montana

        For Respondents:

            McDougal, Meloche, Love & Eckis, El Cajon, California
            Lynn McDougal argued, (Ehly), El Cajon, California
            Huppert & Swindlehurst, P.C., Livingston, Montana

            Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana
            George Dalthorpe argued, (USSIN), Billings, Montana

---

                        Submitted:  May 24, 1984

                        Decided:    August 28, 1984

Filed:  AUG 28 1984

_Ethel M. Harrison_
_____
                    Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Dorothy, Bruce and Cassandra Cady appeal judgments entered in the District Court of the Fourteenth Judicial District, Meagher County, in favor of Ray Ehly and James Ussin. We affirm in part and reverse in part.

Ehly filed a complaint seeking specific performance of a buy/sell agreement executed by the Cadys and him, an immediate preliminary restraining order restraining the Cadys from selling, encumbrancing or transferring the property involved, a hearing on the merits of the case, and $500,000 in general and special damages. The preliminary injunction was granted on September 15, 1981. An amended complaint filed October 8, 1981, sought additional relief in the form of reformation of the contract and exemplary damages. A second amended complaint added James Ussin, the Cadys' realtor, as a defendant and a prayer for $500,000 in damages from Ussin in the event the court found that the Cadys were excused because of Ussin's conduct.

Ussin cross-claimed in his answer against the Cadys, alleging entitlement to his commission. The Cadys, in response, made affirmative claims against Ehly and Ussin.

Before the trial, Ehly abandoned his claim for specific performance. A nonjury trial was held July 26 through 30, 1982. At the conclusion of Ehly's case-in-chief, the District Court granted the Cadys' motion to dismiss Ehly's claim for punitive damages and the injunction was vacated.

The District Court filed findings of fact and conclusions of law on October 26, 1982, and adopted virtually verbatim Ehly's and Ussin's proposed findings and conclusions. Ussin was awarded his commission and judgment against

the Cadys and Ehly on the various other claims. The Cadys filed a notice of appeal of the Ussin judgment on November 15, 1982.

By judgment entered November 18, 1982, Ehly was awarded approximately $245,000 in damages from the Cadys and his attorney fees and expenses. A notice of appeal of this judgment was filed on December 8, 1982.

After a hearing held December 8, 1982, the District Court filed supplemental findings and conclusions regarding attorney fees and expenses. Ehly was allowed almost $52,000 in attorney fees and $350 in additional costs. Final judgment was entered on January 19, 1983, and the Cadys appeal the judgments in favor of Ehly and Ussin.

The Cadys own a livestock ranch located in Meagher County of approximately 10,000 acres. The property was listed for sale with James Ussin, d/b/a U Bar S Real Estate, early in April 1981. According to the listing agreement, the selling price was $2,250,000, 5 percent of which Ussin was to receive as a commission "upon effecting a sale of the whole or any part of said property."

Bruce Cady holds a college degree in accounting, as well as one in psychology. Dorothy Cady received a business decree and has done graduate work in business education. Bruce Cady worked as an accountant before he became a farmer, and Dorothy Cady worked as a legal secretary.

Ray Ehly, a contractor from California, was interested in buying a Montana ranch for investment and tax purposes. Ehly was shown the Cady ranch in early April 1981 by Ussin. Ehly's first two offers of $2,100,000 and $2,220,000 were summarily rejected by Cady as not providing the full purchase price. Ehly decided he wanted to make a final offer to the

Cadys in person, so he arranged a meeting with Ussin in Harlowton on April 20, 1981. Ehly met Ussin and another realtor, Lewis, in Harlowton. As they were driving toward the Cady ranch, they stopped to prepare a written offer. As they were typing an earnest money receipt and agreement to sell and purchase in one of the vehicles, Ussin advised Ehly that Cady would not accept his offer of $2,230,000, but that Ussin would be willing to reduce his commission by $20,000 to make a sale. Ehly and Ussin did not work out the details of the commission reduction at that time, but agreed that the offer to Cady should read $2,250,000 and Ussin's reduction should make up the difference between what Ehly would pay and what Cady would get. Ehly signed the agreement which quoted a $2,250,000 purchase price, and provided a check for $100,000 earnest money.

Upon arrival at the Cady ranch, the parties discussed the agreement for approximately two hours. Following the discussion, Ehly left the Cady ranch to attend a wedding and the Cadys, Ussin and Lewis drove to Lewistown to meet with Marvin Stephens, the Cadys' accountant. Stephens first met with the Cadys, and later the realtors joined the meeting. For three to four hours the agreement was discussed and after certain changes were made, the Cadys signed and initialed the agreement. On April 21, 1981, Ehly agreed to the changes made at the Lewistown meeting.

The agreement provided that Ehly pay $370,000 (including the $100,000 earnest money) as a downpayment upon closing of the chattel sale. He was to pay $50,000 on November 1, 1981, and $350,000 on January 8, 1982. Title to the livestock and other ranch chattels was to be transferred in May 1981, but title to the property was not to be transferred until January

1982, to facilitate Ehly's income tax plans. It was known by the Cadys that Ehly was purchasing the ranch at least partially for income tax reasons.

Ehly also agreed to transfer to the Cadys ten acres of land in the Gallatin Valley, with a value of $75,000. Ehly would assume a $60,000 mortgage on the Cady property and would be ready to pay $200,000 cash if the Cadys needed the money to make a tax-free exchange. There was no issue as to Ehly's ability to fulfill his obligations under the agreement.

The Cadys insisted that their attorney, Leonard McKinney, prepare the closing documents. When Ehly received the documents prepared by McKinney, Ehly's attorney, Jim McLean reviewed them and found that they contained terms substantially different from those in the April 20 agreement. On May 11, 1981, McLean informed McKinney about the discrepancies and stated that Ehly was prepared to close the sale as soon as accurate documents were prepared.

In anticipation of the sale, Ehly purchased livestock and ranch equipment. He arranged with Cady to place the livestock and equipment on the ranch, as well as to have his son and daughter-in-law move from California to the ranch. He also hired a ranch manager.

On May 15, 1981, at a meeting attended by the parties in Lewistown, Ehly was given another set of closing documents. These also did not comply with the April 20 agreement. While discussing the agreement and sale of the ranch, Bruce Cady became angry and left the room. Testimony at trial indicated that before leaving the room, Cady made a comment about his not wanting to comply with the April 20 agreement and about there being no sale unless it was done his way.

- 5 -

After a break, Cady returned to the meeting and the parties discussed the release clause of the agreement, which reads as follows:

> "Buyer may request a release of a parcel of land for building purposes. Seller shall grant said release if buyer will pay the sum of $1,000.00 per acre for said release.
>
> "Principal payment shall apply towards the $1,000.00 per acre. Buyer shall have the right to release 320 acres as of the date of closing of the real property."

As the Cadys were interpreting the language differently from Ehly, discussion was conducted and the differences were resolved. After agreeing that any release of land according to the above clause be limited to 320 acres, in no more than three parcels of not less than 40 acres each which would not affect the "economic integrity of the ranch," the meeting ended. This interpretation of the clause was not consistent with Ehly's initial interpretation, but he was eager to complete the sale and agreed with the Cadys' interpretation.

On May 20, 1981, Ehly received a third set of documents which did not accurately reflect the terms of the April 20 agreement or the clarification of the release clause agreed upon at the May 15 meeting. Stephens withdrew the documents and promised to send Ehly the proper papers by June 1. Ehly did not receive any papers on June 1. On June 2, the parties met at the Cady ranch. Cady stated that he would not sell the ranch according to the buy/sell agreement and produced a list of new demands and terms on which he would sell.

One of the new terms was transfer of the title to the real property in 1981, rather than 1982, thus destroying Ehly's planned income tax advantages. Cady claimed that such transfer was required to maintain the cattle grazing permits Cady held to Forest Service land adjacent to the Cady ranch.

The Cadys claimed that Forest Service regulations prevented the transfer of the grazing permits to Ehly unless Ehly acquired title to the chattels and to the land in the same year.

By letter dated June 3, 1981, Carl Fager, a Forest Service official informed Cady that, although a buyer usually satisfies the permit requirements by taking title to the base property and the chattels in the same year, alternatives existed. Ehly could (1) buy the livestock and execute a contract to purchase the real property; (2) not use the permits for one year; or (3) delay transfer of the title to the livestock until November 1981, when the grazing season ended. Ehly was willing to take any of these alternatives, but the Cadys demanded that both the livestock and land be transferred in 1981. Such a sale would cause Ehly to lose substantial investment tax credit on his income taxes.

At the end of another meeting on June 5, Ehly's attorney was to prepare a contract based on the April 20 buy/sell agreement as modified by the June 5 agreements. McLean drafted the contract and on June 12, Ehly signed it and attached a check for the remainder of the downpayment ($270,000) and a deed for the Gallatin Canyon property. The Cadys refused to sign the contract, and this suit was filed July 2, 1982.

Following a nonjury trial, the District Court found that the Cadys had refused to recognize the validity of the April 20 buy/sell agreement, but that they had partially performed the agreement by accepting, through Ussin, the $100,000 earnest money, by allowing Ehly's son to move onto the ranch, and by allowing Ehly to place livestock on the ranch. They had, by their conduct, led Ehly to believe that they intended

to fulfill their obligations under the agreement, causing Ehly to make expenditures and incur damages.

The District Court also found that the Cadys received at least one verbal offer of $2,500,000 for the ranch from another party and that they attempted to defeat the April 20 agreement so they could take advantage of the verbal offer. The court further found that the executed agreement did not jeopardize the Forest Service grazing permits, given the existence of alternatives.

The court concluded that the April 20 agreement was a valid enforceable contract upon which Ehly could sue for nonperformance. The Cadys understood the contract at the time of execution, and there was a meeting of the minds then and after the May 15 meeting. According to the District Court, the release clause was unambiguous and constituted a peripheral part of the contract because it was optional. Ehly was at all times ready, willing and able to perform his obligations, but the Cadys breached the contract by failing to perform. Thus, Ehly was entitled to the damages reasonably foreseeable and proximately caused by the Cadys' breach.

As to Ussin, the District Court found that, through the efforts of Ussin and Lewis, U Bar S Real Estate performed its obligations under the listing agreement. It found that Ussin was not guilty of any wrongful act making him liable to either Ehly or Cady for any of the requested relief. It concluded that although Ussin did not tell the Cadys about the commission reduction agreement with Ehly, he acted in the Cadys' interest and did not violate any fiduciary duty owed them. Ussin was, therefore, entitled to his commission.

This appeal considers the following issues:

1. Was a valid and enforceable contract formed on April 20, 1981?

2. Was the agreement, if valid, impossible to perform given the limited methods by which the grazing permits could be transferred?

3. Were the damages allowed by the District Court properly computed and based on substantial evidence?

4. Is Ussin entitled to his real estate commission?

I

## April 20 Agreement

The Cadys contend that there was no enforceable contract between the parties. Because the parties never agreed as to the meaning of the release clause and because Ehly never agreed to pay the $2,250,000 asking price, there was no meeting of the minds. As an alternative, the Cadys contend that Ehly breached the contract by not rendering the payment on May 15 as agreed.

Ehly claims that the earnest money receipt and agreement to sell and purchase, signed by the parties on April 20, constituted an enforceable contract. He states that the evidence shows that the Cadys voluntarily signed the document, with ample opportunity to review it, and were fully capable of understanding the terms and the importance of their obligations.

As to the release clause, Ehly maintains that the language was not ambiguous. If ambiguous, the ambiguity should not have defeated the contract, as the clause was not a material provision of the contract but collateral to the central subject matter. The Cadys' interests could not have been harmed by exercise of the clause. In addition, any

ambiguities, in the April 20 agreement were cured during the May 15 meeting. The agreement reached then cleared up any differences in interpretation of the clause and the consent by the Cadys on May 15 ratified the April 20 agreement.

Ussin's contentions are basically the same as Ehly's with regard to this issue. He claims a valid contract was formed, based on mutual consent to the terms and agreement on May 15 to the interpretation of the release clause. Ussin also contends that an agreement was reached as to the purchase price, as evidenced by the April 20 agreement stating that Ehly was obligated to pay $2,250,000. Ehly properly tendered performance of the contract, given his readiness, willingness and ability to perform once the proper closing documents were provided.

The District Court's finding that the April 20 buy/sell agreement signed by the Cadys and Ehly was an enforceable contract is supported by substantial evidence. It is undisputed that the Cadys were capable of understanding the language of the agreement and were cognizant of their choice not to sell the property. It is also undisputed that there was much discussion of the agreement on April 20 before the Cadys signed the document.

The buy/sell agreement contained the essential elements of a contract: identifiable parties capable of contracting; their consent; a lawful object; and a sufficient cause or consideration. Section 28-2-102, MCA. The Cadys raise an issue as to their consent to the contract based on the assertions that (1) the full purchase price was not to be paid by Ehly, and (2) the release clause of the contract was ambiguous, leaving the parties with varying interpretations.

First, the fact that Ehly and Ussin made an agreement to reduce Ussin's commission did not affect Ehly's obligation under the written agreement to pay the purchase price of $2,250,000. In the end the Cadys would receive the same amount of money as if Ehly were to pay the full $2,250,000, as the reduction in Ussin's commission would not reduce the net selling price to be paid to the Cadys.

Second, the language of the release clause must be interpreted by a court according to general contract rules. An interpretation which will make the contract lawful, operative, definite, reasonable and capable of being carried into effect is favored. Section 28-3-201, MCA. And the language is to govern the interpretation if it is clear and does not involve an absurdity. Section 28-3-401, MCA.

Here we are concerned with the following language:

"Buyer may request a release of a parcel of land for building purposes. Seller shall grant said release if buyer will pay the sum of $1,000.00 per acre for said release.

"Principal payment shall apply towards the $1,000.00 per acre. Buyer shall have the right to release 320 acres as of the date of closing of the real property."

Initially, the language appears unambiguous as to what the rights of the parties are with regard to releasing a portion of the property. There was testimony as to the varying interpretations of the clause by the Cadys, but they are not substantiated by evidence of misrepresentation by the realtors or Ehly. Furthermore, the evidence clearly shows that the differing interpretations were expressed during the May 15 meeting and that during that meeting, an agreement was reached as to how the clause should be interpreted.

Section 28-2-304, MCA, provides that a "contract which is voidable solely for want of due consent may be ratified by

- 11 -

a subsequent consent." The Cadys' claim that there was no consent to the contract based on varying interpretations of the release clause cannot stand given the evidence that the parties reached an agreement May 15.

As to the alleged breach of the contract by Ehly, the District Court's finding is also supported. The evidence clearly shows that the parties initially planned to execute the closing documents on May 15. On that date, Ehly received a second set of documents which did not conform to the April 20 agreement. He expressed his willingness and ability to perform as soon as conforming documents were delivered. After receiving another set of erroneous documents and another meeting, Ehly drew up a contract, signed it, and sent it to the Cadys with the remainder of the downpayment. In essence, Ehly's nonpayment on May 15 was not due to a lack of desire or ability to perform, but was due to the absence of the conforming documents promised by the Cadys.

According to Rule 52(a), M.R.Civ.P., the District Court's findings regarding the existence of an enforceable contract is affirmed, since the findings are not clearly erroneous.


II

Impossibility of Performance

The Cadys claim that the April 20 agreement was impossible to perform because it would endanger transfer of the Forest Service grazing permits. Any transfer of the title to the land to facilitate transfer of the permits would not be according to the April 20 agreement.

Ehly and Ussin maintain that any of the three alternatives described earlier, as allowed by Forest Service

regulations, would have been consistent with the April 20 agreement, and without risk or detriment to the Cadys' interests.

The burden rested with the Cadys to prove that impossibility existed, and they must have demonstrated that they did everything within their powers to perform the contract. Miller v. Titeca (Mont. 1981), 628 P.2d 670, 38 St.Rep. 853; Smith v. Zepp (1977), 173 Mont. 358, 567 P.2d 923. The Cadys did not meet their burden here, as they did not show that they took every action they could to perform the contract. Rather, they rejected any of the alternatives available for transferring the grazing permits and insisted that title to the land be transferred in 1981. That was the one alternative which was inconsistent with the April 20 agreement, in terms of facilitating Ehly's plan to realize a tax credit.

The District Court's finding that the contract was not impossible to perform because of the grazing permit requirements is affirmed.


III

Damages

A.    Tax losses and benefits

General damages in the amount of $183,080 were awarded by the District Court as income tax damages allegedly suffered by Ehly because of the breach of contract. The figure was arrived at by Ehly's accountant by first computing his federal and California tax obligations, then subtracting the depreciation on the ranch chattels, had they been bought. By claiming investment tax credits, he would have allegedly saved $80,688 in income taxes for 1981. Ehly then added an amount for the taxes he would have to pay on the damage award

if he were successful in getting the award, coming up with a total of $181,321 due him. The District Court awarded him $183,080 on this basis.

The Cadys contend that the award was improper because (1) the loss of tax benefit was not foreseeable by the Cadys as damages for breach of the contract; (2) Ehly failed to mitigate his damages by purchasing similar property; and (3) the damage award was derived from and based on speculation, rather than ascertainable figures.

Ehly claims that the loss of tax savings was foreseeable by the Cadys as they knew that Ehly's main reason for buying the ranch was to obtain tax savings. In response to the claim that he should have mitigated his damages by purchasing similar property, Ehly contends that (1) the Cady ranch is a unique and remarkable piece of property, which could not be replaced easily and (2) it was too late in the year (1981) for Ehly to search and negotiate for another piece of property.

Generally, the measure of damages in a breach of contract case is:

". . . the amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby or in the ordinary course of things would be likely to result therefrom. Damages which are not clearly ascertainable in both their nature and origin cannot be recovered for a breach of contract." Section 27-1-311, MCA.

Certainty exists when evidence provides a reasonable basis for determining a specific amount. Cremer v. Cremer Rodeo Land and Livestock Co. (Mont. 1981), 627 P.2d 1199, 38 St.Rep. 574; Smith v. Zepp (1977), 173 Mont. 358, 567 P.2d 923.

An examination of section 27-1-311, MCA, above, will reveal two kinds of damages recoverable for breach of

contract. Damages "for all the detriment caused thereby" include all damages which in the ordinary and natural course of things are proximately caused by the breach itself. These damages are the natural result of the breach. Damages under the statute may also be recovered "which in the ordinary course of things would be likely to result therefrom." Our court, and courts everywhere, recognize this provision as permitting recovery for consequential damages within the contemplation of the parties when they entered into the contract, and such as might naturally be expected to result from its violation. Myers v. Bender (1913), 46 Mont. 497, 508, 129 P. 330, 333. These damages are the contemplated result of the breach.

All damages for breach of contract, whether natural or contemplated, are subject to limitations of causation, certainty and foreseeability. They must be clearly ascertainable in their nature and origin. Section 27-1-311, MCA. They must be reasonable. Section 27-1-302, MCA.

We regard Ehly's gain of investment tax credit upon performance of the contract as within the contemplation of the parties and reasonably foreseeable. Ehly made no secret that a tax savings was one of his objectives in buying the property. The failure of the Cadys to perform their obligations under the contract negated the possibility of Ehly claiming the investment tax credits. It follows that the Cadys' nonperformance was the legal cause of the lost opportunity. This lost tax opportunity can be measured in dollars and cents as Ehly's accountant demonstrated. The original contract called for performance within a specific tax year: the ranch chattels upon which the tax credit were based were to be transferred in 1981. The tax credit was calculated on

the basis of Ehly's tax liability for that year. In order to provide Ehly with the benefit of his bargain, we uphold the $80,688 damages based on his lost investment tax savings. These damages were reasonably foreseeable and ascertainable.

Ehly also requested and received additional damages to offset taxes he claimed he would have to pay on the award. Ehly requested $181,321 so that when taxes based on his projected state and federal total tax rate of 55.5 percent were subtracted, his net return would be $80,688.

We appreciate the concern of Ehly's counsel that his client be made whole. We also realize that the damages for breach of contract will potentially be considered taxable income. However, we know of no authority, nor has counsel provided us with any, whereby an award for lost tax savings may be ballooned in anticipation of additional taxation. We decline to create such precedent in this case. The additional monetary relief was erroneously granted.

B.   Interest and expenses

The District Court also awarded Ehly prejudgment interest at the rate of 10 percent on:   (1) Ehly's federal and state income tax obligation; (2) the $100,000 earnest money; and (3) Ehly's capital expenditures on the ranch.

The District Court awarded Ehly expenses incurred after the lawsuit was filed and losses related to the legal action and not related to the legal action.

As for Ehly's claim for interest, section 27-1-211, MCA, applies:

> "Every person who is entitled to recover damages certain or capable of being made certain by calculations and the right to which is vested in him upon a particular day is entitled also to recover interest thereon from that day except during such time as the debtor is prevented by law or by the act of the creditor from paying the debt."

Here, the interest on the earnest money of $100,000 is all that should be allowed as prejudgment interest. Interest should then be allowed on the judgment amount according to section 27-1-211, MCA. Prejudgment interest should be 6 percent per annum, according to section 31-1-106, MCA, and interest on the judgment should be 10 percent per annum, according to section 25-9-205, MCA.

The award for Ehly's refiling and postfiling expenses exceeded the amounts allowed by law. Section 25-10-101, MCA, outlines when costs are allowed to a plaintiff and section 25-10-201, MCA, states what costs are allowable. The cost of depositions not used during trial as evidence or for impeachment are not allowed. Lovely v. Burroughs Corporation (1974), 165 Mont. 209, 527 P.2d 557.

Ehly claimed as expenses capital expenditures made in anticipation of the sale of the ranch, such as the purchase of livestock. He also claimed various travel expenditures based on his trips from California, his son and daughter-in-law's move from California and the wages paid to his son to manage the ranch. Some of these do not fall within the allowable costs as they would not have been chargeable to the Cadys had the contract been performed.

The portion of these expenses which should be allowed is any loss suffered by Ehly as a result of capital expenditures made from the time the buy/sell agreement was signed on April 20, 1981, to the time of breach by the Cadys. The breach occurred after June 12, 1981, when Ehly tendered performance by drawing up a contract, signing it, and sending it, with the remainder of the downpayment, to the Cadys. The losses occurred because of Ehly's reliance on the buy/sell agreement and include the wages paid to Ehly's son as payment to insure

care of the cattle and other livestock, listed as capital expenditures.

C.   Attorney fees

After denying the Cadys' motion to abate the proceedings to determine attorney fees, the District Court held a hearing and heard testimony on the issues.   A notice of appeal to this Court of the Ussin judgment had been filed previously and a notice of appeal of the Ehly judgment was filed the same day the hearing was held.   Ehly was awarded $51,979.65 in attorney fees.

The Cadys claim that the attorney fees were improperly awarded as there was no provision in writing for attorney fees nor is there a statute which applies to allow them. They also contend that, according to case law, the District Court had no jurisdiction at the time of the hearing on this issue, as the case had been appealed to this Court.

Ehly contends that the court specifically retained jurisdiction to determine attorney fees.   And Ehly claims that this case is an exception to the general rule regarding allowance of attorney fees in that the fees were a necessary and incidental cost of obtaining rightful possession of property.

The attorney fees should not have been allowed.   It is a well-settled rule that absent contractual or statutory grant, attorney fees are not allowable as costs or as an element of damages.   Foy v. Anderson (1978), 176 Mont. 507, 580 P.2d 114.   The case urged as applicable here involved a lessee attempting to take possession of the leased property.   After stating the above rule of law, this Court stated:

> ". . . This rule precludes recovery of attorneys'
> fees paid in an action for breach of contract, as a
> part of the damages for the breach.   However, the

small amount here claimed is not for attorneys' fees in the sense in which that term is used in the above rule; it is but an amount paid out, incidentally to attorneys, in plaintiff's attempt to get possession of the land covered by his contract, and under a proper showing that such payment is an element of compensatory damages, is to be treated as one of the legal consequences of the original wrongful act." (Citations omitted.) Smith v. Fergus County (1934), 98 Mont. 377, 384, 39 P.2d 193, 195.

There was no evidence in this case that Ehly's claim for attorney fees should be allowed as compensatory damages and, thus, they should not be allowed at all.


IV

## Ussin's Commission

The Cadys contend that the language in the listing agreement between U Bar S Real Estate and them precludes payment of Ussin's commission, as there was no sale of the property. The pertinent language reads:

"The Owner agrees to pay to the broker out of the first part of the purchase price, upon effecting the sale of the whole or any part of the property, as compensation for services 5% of the purchase price."

They argue that the two conditions of agreement, that there be a sale and that the purchase price be paid, were not fulfilled.

In this case, there was not only a listing agreement, but a clause in the buy/sell agreement which stated:

"For valuable consideration I/we agree to sell and convey to the purchaser the above described property on the terms and conditions hereinabove stated and agree to pay to above named agent a commission amounting to 5 percent of the above mentioned selling price for services rendered in this transaction."

The Cadys breached this portion of the buy/sell agreement by not paying Ussin the stated commission "for services ren-

dered." According to the agreement, Ussin is entitled to his commission and the obligation must be met.

In Diehl & Associates, Inc. v. Houtchens (1977), 173 Mont. 372, 377-379, 567 P.2d 930, 933-935; this Court stated:

> "It is generally accepted law that a real estate broker is entitled to commissions when he has, in pursuance of his employment and within the time specified in the contract of employment, procured a purchaser able, ready and willing to purchase the seller's property on the terms and conditions specified in the contract of employment. Roscow v. Bara, 114 Mont. 246, 135 P.2d 364; 12 Am.Jur.2d 921, Brokers Section 182. When the broker procures a buyer who makes a counteroffer or agrees to terms at variance to the terms specified in the employment contract, the seller has the option of accepting or rejecting the counteroffer. If the seller accepts the counteroffer of the procured buyer, the seller is legally obligated to pay commissions to the broker, either under the terms of the contract of employment or the mutually agreed terms of a contract for sale.

> "The broker's ability to recover commissions is premised on the broker's ability to accomplish what he undertook to do in his contract of employment. 32 A.L.R.3d 321, section 2. The broker is not entitled to compensation for unsuccessful efforts under his contract of employment, irrespective of how great his efforts were or how meritorious his services. Roscow v. Bara, supra. It is generally necessary to refer to the specific terms of the particular employment contract in order to determine whether or not the broker's duties have been performed.

> ". . .

> "We note the distinction between a brokerage contract which requires a broker to merely find a purchaser and a brokerage contract which requires a broker to sell, make or effect a sale. In the first case the broker earns his commission when he procures a buyer able, ready and willing to purchase on the seller's terms. A broker employed to sell or effect a sale does not earn his commission until he completes the sale. Completion of the sale, where real property is involved, amounts to payment of the purchase price and conveyance of title. O'Neill v. Wall, 103 Mont. 388, 62 P.2d 672."

In Diehl, this Court found a breach by the buyer of the buy/sell agreement which defeated a sale. Since there was no sale, the realtor was not entitled to a commission.

In the subsequent case of Associated Agency of Bozeman, Inc. v. Pasha (Mont. 1981), 625 P.2d 38, 43, 38 St.Rep. 344, 348-349, this Court stated the following:

> "We acknowledge that this Court had stated that a broker employed to 'sell or effect a sale' and exchange (as is the case here) does not earn his commission until the purchase price is paid, title is conveyed and the sale is completed. See Diehl and Associates, Inc. v. Houtchens (1977), 173 Mont. 372, 567 P.2d 930. In an expansion of this holding, however, we must also conclude that a broker is still entitled to his commission even if the sale is not completed if a ready, willing and able buyer is procured and the failure to consummate was solely due to the wrongful acts or interference of the seller. See Taylor v. Gaudy (1980), 46 Or.App. 235, 611 P.2d 336; Fender v. Brunken (Colo.App. 1975), 534 P.2d 347; Red Carpet Real Estate of Aloha, Inc. v. Huygens (1974), 270 Or. 860, 530 P.2d 46; see also Ellsworth Dobbs, Inc. v. Johnson (1967), 50 N.J. 528, 236 A.2d 843. . . ."

The Court went on to find the realtor entitled to his commission, on the ground (not pertinent here) that the listing agreement allowed for payment of the commission in the event of wrongful termination by the buyer.

In this case, both the listing agreement and the language from the buy/sell agreement assume that the real estate commission would be paid when a sale was effected. The District Court properly found that a sale would have been consummated had the Cadys not wrongfully refused to comply with the buy/sell agreement. Thus, according to Associated Agency, supra, Ussin is entitled to his commission on this basis also.

The Cadys also contend that Ussin is not entitled to a commission because he breached a fiduciary duty owed by him to the Cadys. The commission reduction agreement between Ussin and Ehly was not communicated to the Cadys; the Cadys assert that this was a breach of Ussin's fiduciary duty. They cite Nardi v. Smalley (Mont. 1982), 643 P.2d 228, 39

St.Rep. 606, and First Trust Co. v. McKenna (Mont. 1980), 614 P.2d 1027, 37 St. Rep. 1026, as describing the appropriate standard for a broker-seller relationship.

Ussin claims that he exercised good faith in trying to help the Cadys sell the ranch and that he breached no fiduciary duty owed to the Cadys by reducing his commission. He distinguishes fee-splitting arrangements, which have been declared void by some courts, from the commission reduction agreement in this case. He argues that the agreement was between Ehly and Ussin and thus did not affect the Cadys. He points out that the Cadys did not testify that they would not have signed the April 20 agreement had they known about Ussin and Ehly's agreement.

The fiduciary duty owed to a seller by a broker is discussed in Nardi and First Trust Co., supra. These cases stand for the propositions that the fiduciary duty is breached if (1) a seller is foiled or deceived by the contract or does not understand the contract, or (2) full disclosure of all pertinent facts is not made by the broker. Neither of the cases are completely on point with this case.

Arguably there was a breach of Ussin's duty to inform the Cadys of pertinent facts. More importantly, though, the Cadys have failed to prove any damage resulting from the failure to inform. As noted earlier, the Cadys would not have suffered monetarily or otherwise from the agreement between Ehly and Ussin. Ehly obligated himself to the $2,250,000 purchase by signing the buy/sell agreement. The flow of money to the Cadys would still be the same. Thus, there was arguably no prejudice suffered, and Ussin should not be denied his commission on this basis.

The District Court properly limited Ussin's commission to $92,500, according to Ehly and Ussin's agreement.

We affirm the judgment of the District Court in favor of Ehly and Ussin; we remand the case for recalculation of Ehly's damages in accordance with Part III of this opinion. Each party shall bear his or her own costs of appeal.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

Justices

Mr. Justice John C. Sheehy, concurring and dissenting:

I concur with nearly all that is said in the foregoing opinion, but its otherwise excellent content is flawed by determining the loss of an investment tax credit in this case by Ehly as reasonably foreseeable. As to that item of damages, I dissent.

Loss of investment tax credit by reason of Ehly's breach fails here as an item of damages because it does not meet the tests of causation, certainty and foreseeability. Cady did not cause Ehly's income tax liability; his income tax liability arose from the fact that Ehly was making money in other places. The loss of investment tax credit is not an item of damages clearly ascertainable in nature and origin. The loss would depend on tax laws which frequently change, the taxpayer's circumstances, and a myriad of other possibilities. The injection of tax consequences as damages in such case as this present a quagmire. The District Court here was forced to consider possible tax shelters, exemptions, and complex tax laws which vary in result from year to year and from taxpayer to taxpayer. This case, in effect, turned from an action for breach of contract to a tax case. The District Court had to consider the tax laws for the year of the breach, 1981, and in awarding additional damages to cover possible taxes on the judgment award, the tax laws in the year of the trial. It should be a matter of judicial notice that there can be no certitude, even as to a single taxpayer, as to the income tax consequences of a breach of contract for the purchase and sale of a farm ranch. No certain method of mitigating such tax loss could be produced by the defense to reduce the claimed damages.

The first example of uncertainty is the fact that if Ehly had gained an interest in this property, even on a small downpayment in 1981, he would have no investment tax credit available. It was necessary for him not to take title until 1982. He never engaged in farming or ranching the Cady property so there can be no certainty as to whether Ehly would or would not have made a profit on the Cady ranch. Although the accountant in reaching the damage figure to which he testified on behalf of Ehly took into account a Montana income tax return, Ehly had never filed a Montana income tax return. The depreciation schedule propounded by the accountant on behalf of Ehly included 90 miles of fence at replacement cost, $270,000, although the existing fences were not replaced. The depreciation projections also took into account the projected building of four dams and their estimated cubic yardage and cost. The dams did not exist at the time of trial. Although Ehly had agreed to buy from Cady cow/calves at $600 per pair, the accountant used the figure of $800 per pair for his depreciation schedules, the highest price at which cattle had been sold in 1981. The accountant used $411 per yearling in his depreciation schedule, although the price to Ehly would have been $350 apiece. The total result of the accountant's testimony was that on the purchase price of $2,250,000, Ehly would have claimed total depreciation of $1,523,000.

The accountant's testimony is the basis for the court's award of damages for loss of investment tax credit. I insist that the testimony is too vague, uncertain and speculative to be accorded any relevance. For that reason, I would disallow the damages claimed on that item.

John C. Sheehy
Justice