**CITIZENS FEDERAL BANK, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–656C.

United States Court of Federal Claims.

Filed Jan. 23, 2004.

Originally Filed Under Seal Dec. 23, 2003.

Charles J. Cooper, Cooper & Kirk, Washington, DC, for Plaintiff.

Henry Roland Felix, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION

DAMICH, Chief Judge.

This *Winstar*-related case is before the Court on Plaintiffs' Motion for Partial Summary Judgment and Defendant's Cross–Motion for Partial Summary Judgment on the issue of damages for breach of contract. In a previous opinion, the Court found that Defendant was liable to Plaintiffs, Citizens Federal Bank, FSB, et. al. ("Citizens") because the contract they entered into with Defendant was breached by the Financial Institution Reform and Recovery and Enforcement Act of 1989 (hereinafter "FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 and its implementing regulations, which no longer permitted Citizens to treat supervisory goodwill or capital credit as regulatory capital. The Court subsequently held that Citizens was not entitled to restitution or reliance damages, and that factual issues precluded the Court from granting summary judgment to either party on the issues of lost profits and cost of replacement capital. For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment is GRANTED, IN PART, AND DENIED IN PART. Defendant's Cross–Motion for Partial Summary Judgment is GRANTED, IN PART, AND DENIED IN PART.

## I. BACKGROUND

During the second savings and loan crisis of the 20th century—during the early 1980's—federal regulators were seeking healthy thrifts, like Citizens and its parent company, to take over a plethora of thrifts that began to fail during this time period due to high interest rates and inflation.[1] This breach of contract action and related damages claims result from Citizens' acquisition of two thrifts, Equitable Federal Savings and Loan Association of Lancaster, Ohio and

American Savings Bank of Springfield, Illinois. At the time of the acquisitions, Citizens was a principal wholly-owned subsidiary of Citizens Savings Financial Corporation ("CSFC"). Citizens was a Florida-based thrift and also a federal savings bank, as it was a member of the Federal Home Loan Bank of Atlanta. In 1986, Citizens expanded its market outside of Florida when Citizens and its parent acquired the first failed thrift, Equitable Savings, which had 26 branch offices in Ohio.[2] To acquire the thrift, Citizens accepted the Government's solicitation to bid for its acquisition, which was accomplished with minimal cash expenditure. At the time of the acquisition, Equitable's net worth was a negative $15.8 million. Because Citizens was to acquire Equitable in substantial debt, regulators gave Citizens various regulatory concessions, including the recording of supervisory goodwill in the amount of $35.9 million, which was to be amortized on a straight-line basis over a period of 25 years. *See Citizens Federal Bank FSB v. United States,* 51 Fed.Cl. 682, 685 (2002).

FIRREA was enacted on August 9, 1989. The newly enacted law disallowed the use of goodwill to meet mandatory capital requirements and mandated that the treatment of goodwill as capital for regulatory purposes would be phased-out over time. With respect to the Equitable transaction, this Court found that FIRREA breached the agreement Citizens made with the Government with respect to the Equitable transaction. *Citizens Federal Bank,* 51 Fed.Cl. at 688. Specifically, the Court found that FIRREA and its implementing regulations prevented Citizens from recording supervisory goodwill in accordance with its agreement and it denied the treatment of its supervisory goodwill and capital credits as capital assets for purposes of regulatory requirements. *Id.* Likewise, Citizens acquired the second thrift, American Savings

---

1. Because the history surrounding the 1980's savings and loan crisis and the subsequent enactment of FIRREA has been discussed extensively in the original *Winstar* opinion, *see United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and in other *Winstar*-related cases before the United States Court of Appeals for the Federal Circuit ("Federal Circuit") and the United States Court of Federal Claims, and this Court's previous liability opin-

ion, the Court will only recite the history as is necessary to this decision.

2. The Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC") solicited Citizens and CSFC to submit a proposal to acquire the thrift. *See Citizens Federal Bank, FSB v. United States,* 51 Fed.Cl. 682, 684 (2002).

Bank, which expanded its operations to Springfield, Illinois. This acquisition too was accomplished with little cash expenditure on the part of Citizens, and Citizens was afforded various regulatory concessions. Citizens ultimately recorded a capital credit of $86 million and $17 million in supervisory goodwill which, after the enactment of FIRREA, would no longer be treated as capital for purposes of meeting regulatory requirements. Thus, the Court held that FIRREA breached the merger agreement that Citizens entered into with the Government with respect to American Savings. *Citizens Federal Bank*, 51 Fed.Cl. at 688, *recons. denied,* 53 Fed.Cl. 793 (2002).

Nevertheless, Citizens was in regulatory compliance despite FIRREA's enactment in 1989. FIRREA imposed more stringent capital reporting requirements on the savings and loan industry, creating three new categories of capital standards and related requirements effective as of December 7, 1989. According to FIRREA, Citizens had to comply with three capital standards: (1) tangible capital requirements (tangible capital "include[s] common stockholders equity, non-cumulative perpetual preferred stock and related surplus, certain qualifying non-withdrawable accounts and pledged deposits, and minority interests in consolidated subsidies, less tangible assets …."); (2) core capital requirements ("tangible capital plus specified amounts of 'qualifying supervisory goodwill' "); and (3) risk-based capital requirements ("core capital plus 'supplementary capital' (which includes specified amounts of cumulative preferred stock, certain limited life preferred stock, subordinated debt and other capital instruments")). Def.'s Appendix on Damages at 119–120 (filed May 2, 2001) (hereinafter "Def.'s App. 1").

It is undisputed that on December 31, 1989, Citizens exceeded its core, tangible, and risk-based capital requirements by $50 million, $21.2 million, and $162.8 million respectively. In fact, at this time Citizens showed only a $13.24 million shortfall in its fully phased-in core capital requirements, but it is also undisputed that at the beginning of 1990, Citizen's core capital was below the level necessary to meet its fully phased-in

requirements, which were to be fully implemented by December 31, 1994. Also undisputed is that on September 30, 1995, Citizens exceeded its core, tangible, and risk-based capital requirements by $192.7 million, $262.4 million, and $202.5 million respectively. On September 14, 1990, Citizens completed an exchange offer of non-cumulative preferred stock for $76.2 million of its subordinated notes, which brought it into compliance with its fully phased-in capital requirements. By December 31, 1990, Citizens reported that it could "ensure its compliance with both the current and fully phased-in regulatory capital requirements without further reduction in assets." Def.App. 1 at 147. Citizens shrank its assets earlier in 1990 "to improve its regulatory capital ratios." *Id.* In an effort to strengthen its capital position, Citizens further increased its tangible and core requirements in May 1991 by $3.7 million by exchanging shares of non-cumulative preferred stock for previously issued subordinate notes. Def.'s App. 1 at 159. Neither party disputes that Citizens incurred $1.6 million in costs related to its legal, accounting and other miscellaneous expenses. Because Citizens sought to maintain a sound capital position despite FIRREA, Citizens was able to meet its regulatory requirements and never fell out of compliance with FIRREA and its implementing regulations. Citizens agreed to be acquired by NationsBank Corporation in 1995.

As stated, this is the second time the present case has been before the Court on damages. The Court issued an opinion on damages, but did not grant Citizens any recovery. *Citizens Federal Bank v. United States*, 52 Fed.Cl. 561 (2002). The Court denied restitution damages because in light of *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001), the benefits to the Government were too uncertain and were precluded as a matter of law. *Id.* at 566. The Court also denied Plaintiffs recovery on a reliance theory because the Court found it untimely and because Citizens' theory upon which the new claim was based was legally flawed. *Id.* The Court declined to rule on lost profits because factual issues remained, which precluded summary judgment. Specifically, the parties

dispute the amount that Citizens' sales price diminished as a result of the breach and whether Citizens failed to mitigate its harm. *Id.* at 563. The Government has contended that Citizens' "capital cushion," the amount of capital in excess of required regulatory minimums, could have been used to acquire more assets and liabilities. *Id.* at 564. Citizens has chosen to forego its lost profits claim, if the Court were to resolve the cost of capital replacement or cover damages in its favor, an issue presently before the Court. Citizens seeks to recover the actual costs associated with the exchange of subordinated debt for preferred stock. Citizens contends that it suffered negative tax consequences as a result of the exchange because payments on preferred stock are not tax deductible and must be paid out of after-tax earnings, as opposed to payments on subordinated debt, which are tax deductible and are made out of pre-tax earnings. Thus, Citizens' after-tax cash flow suffered from the exchange. The Court declined to rule on the issue of cost of replacement capital because the Court found there was a factual dispute as to whether the cost of replacement capital (of their capital cushion) was limited to transaction costs.

Following the issuance of the Court's opinion, a status conference was conducted to discuss how to proceed. From that conference, the Court learned that the parties are in agreement that capital replacement to bring a *Winstar* Plaintiff into compliance with fully phased-in capital requirements is recoverable in damages as a mitigation cost. *Citizens Federal Bank, FSB v. United States*, No. 96–656C, Unpublished Order at 1 (Fed.Cl. August 15, 2002) (hereinafter "August 15, 2002 Order"). The parties disagreed, however, on whether Citizens could recover the cost of replacement of its capital cushion. Defendant argues that Plaintiff did not have to raise in excess of $75 million to make up for a $13 million shortfall in capital requirements. Thus, counsel have filed cross-motions for partial summary judgment addressing the legal issue of whether Citizens is entitled to the replacement value of its "capital cushion" as a cost of mitigation in order to make Plaintiff whole. Related to this overarching issue were several sub-is-

sues, which the Court found required briefing. Specifically, Plaintiff was to address the following:

(1) Is Plaintiff entitled to tax costs as part of its mitigation damages and should such damages be calculated from the date of the transaction or from the present date?

(2) Is Plaintiff entitled to gross-up its out-of-pocket damages where the mitigation costs were paid with after-tax dollars and the award itself will be subject to taxation?

(3) Should mitigation costs incurred prior to the date of judgment be discounted back to the date of the breach? Would failure to discount result in the award of pre-judgment interest?

(4) Should future damages be discounted at a risk-adjusted price, or discounted by the rate of return on conservative investment instruments?

*See* August 15, 2002 Order. Defendant was directed to address the following procedural and legal issues:

(1) Should Plaintiff's theory of measuring damages based on the actual costs resulting from the exchange of subordinated debt for preferred stock be barred as untimely; and, if timely, does it require expert testimony?

(2) May hindsight and after-the-fact evidence be considered in calculating the costs of mitigation?

(3) Must the beneficial effects of mitigation be deducted from the claimed costs of the exchange of subordinated debt for preferred stock?

The Court will address each legal issue sequentially below, however, it will take one threshold issue out of turn. Defendant objects that Citizens' theory of recovery based upon the cost of replacement capital is untimely because it was raised for the first time in Plaintiff's cross-motion for summary judgment after discovery had already been completed. For the reasons stated below, the Court finds that Citizens is entitled to proceed on this theory.

## II. DISCUSSION

### A. Citizens' Damages Theory is not Barred as Untimely

Defendant spends considerable time on its argument that Plaintiff's damages theory is untimely, unsupported by expert opinion, and should not be considered by this Court. Nevertheless, the Government concedes that whether to allow Plaintiff to proceed on this theory is within the Court's discretion. Defendant argues, however, that allowing Plaintiff to proceed would be essentially unfair and costly to both because it has not had the benefit of discovery, as Citizens' expert was never questioned about the theory in deposition. Moreover, Defendant contends that the theory is contrary to Citizens' own expert's report. Finally, Defendant argues that Plaintiff should not be allowed to proffer an expert opinion on the theory because Citizens is past the deadline for submission of final reports as set forth under Procedural Order No. 2 (issued in *Winstar*-related cases) and the Rules of the U.S. Court of Federal Claims ("RCFC").[3] If the Court were to allow the theory over its objection, Defendant states that it should be supported by an opinion of a qualified expert.

Citizens states that it should not be barred from showing the true costs of the exchange offer. Citizens argue that the theory was first introduced by Defendant's expert, thus its argument is offered in rebuttal. Citing *Hansen Bancorp Inc., v. United States*, 51 Fed.Cl. 737 (2002),[4] Plaintiffs argue that Procedural Order no. 2 does not expressly forbid the supplementing of expert reports, and they point out that other judges have allowed additions or revisions to expert reports. If the Court were to deny Citizens' request to supplement its report, then Citizens states the calculations are simple enough that the court could do the calculations without an expert report. Indeed, other judges on this Court have allowed a plaintiff to supplement an expert report that goes beyond the scope of the original report. *Hansen Bancorp, Inc. v. United States*, 51 Fed.Cl. 737 (2002); *First Federal Savings Bank of Hegewisch v. United States*, No. 93–162 (October 17, 2001); *Admiral Financial Corp. v. United States*, No. 93–489 (filed Jan. 31, 2002). This is true even when plaintiff has introduced a totally new damages theory. *The Long Island Savings Bank, FSB v. United States*, No. 92–517 (Fed.Cl. April 15, 2003); *Stan. Fed. Bank v. United States*, No. 92–844C (Fed.Cl. Mar.13, 2002). Procedural Order No. 2 governs discovery and any Rule of this Court that conflicts with it is superceded. ("The Rules of the Court of Federal Claims ('RCFC') govern discovery, except where in conflict with the CMO, Procedural Order No. 1, the MPO, or this Discovery Plan."). Nevertheless, Procedural Order No. 2 does not expressly prohibit the filing of supplemental expert reports. *Hansen Bancorp, Inc.*, 51 Fed.Cl. at 737–38.

The Court is persuaded that allowing Plaintiffs to proceed on a cost of replacement theory would not only be fair and equitable, but also could save the parties the needless time and expense routinely associated with a long trial on lost profits. Because Plaintiffs' theory is based on its actual costs of capital replacement, calculating those costs should be fairly straightforward. Moreover, Plaintiffs' theory is not an entirely new theory, as it relates to expectancy damages and their appropriate calculation. The Government's expert, Dr. Leftwich, addresses the 1990 and 1991 exchange offer in his report, Def.'s App. 1 at 248, and the Government relies on his report to support its argument that Citizens

---

3. Procedural Order No. 2 provides in relevant part that "if plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of that plaintiff." Def.'s App. 1 at 94. RCFC 26(a)(2) governs the disclosure of expert testimony. RCFC 26(a)(2)(C) provides states that disclosure of expert testimony "shall be made at the times and in the sequence directed by the court ...." The Rule does provide that rebuttal reports are to be made within 30 days after the disclosure made by the other party, but ultimately the time frame is in the judge's discretion.

4. Judge Miller found that the discovery plan "required the parties to submit a 'final written report' for each expert, it did not forbid expressly supplementation of or amendment to those reports." *Hansen Bancorp Inc. v. United States*, 51 Fed.Cl. 737 at 738.

is entitled only to transaction costs.[5] Furthermore, Dr. Leftwich's report recognizes that Plaintiffs allege in ¶ 93 of their complaint that the exchange offer was a proximate cause of the breach and questions why Dr. James, Plaintiffs' expert, would not calculate any of the actual costs related to the exchange offer. Leftwich Rpt. ¶ 10, Def.'s App. 1 at 248. Thus, as the Government's own expert raised the issue of cost of replacement capital and suggested that the exchange could have been in response to the breach, the Government cannot now claim unfair surprise. *Id.*, Leftwich Rpt. ¶ 11. For the reasons stated, the Court will allow Plaintiffs to proceed on this theory of recovery. The Court notes that the Plaintiffs have attempted to raise a new damages theory in the past when they introduced a claim for reliance damages in addition to lost profits and restitution. Unlike the reliance theory, which was a "totally new and as-yet-explored area of recovery," *Citizens Federal Bank,* 52 Fed.Cl. at 566, calculating Citizens' actual cost of capital replacement as a basis for recovery was suggested by Defendant's own expert. Plaintiffs seek to build on the replacement costs theory introduced by Dr. Leftwich in his report.

**B. Summary Judgment**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983)). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. After adequate time for discovery and on motion, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, where that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir. 1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir. 1995); *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**C. The Measure of Citizens' Actual Cost of Capital Replacement**

■ Citizens asks for the cost of replacement of its capital cushion, which suffered when FIRREA eliminated Citizens' ability to count supervisory goodwill and capital credit toward regulatory requirements. This claim for recovery is based upon a "cover" damages theory and is a form of expectancy damages.[6] *See, e.g., Home Savings of America FSB v. United States,* 57 Fed.Cl. 694, 722 (2003). The cost of replacement capital has been considered a good measure of parties' expectancy interest in the *Winstar* context

---

5. Dr. Richard W. Leftwich is Defendant's expert in the present case. He is the Fuji Bank/Heller Professor of Accounting and Finance at the Graduate School of Business at the University of Chicago. Mr. Leftwich received a Ph.D. in Applied Economics and Finance and a M.S. in Business Administration from the University of Rochester. Dr. Leftwich is undeniably well-credentialed, accomplished in his field, and as a result has testified as an expert in other *Winstar*-related cases.

6. The word "cover" is an "innovation" of the Uniform Commercial Code ("UCC"). *See Farnsworth on Contracts* § 12.11 n. 7 and accompanying text (citing UCC § 2–712(1)). Nevertheless, the Federal Circuit has found that in the context of a government contract, the UCC, although not governing, and the concepts discussed therein, such as "cover," provide "useful guidance in applying general contract principles." *See Hughes Comm. Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001).

by judges on this Court and the Federal Circuit. *See e.g., LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64, *aff'd in part, vac'd in part, remanded,* 317 F.3d 1363, 1374 (Fed.Cir.2003); *Fifth Third Bank of W. Ohio v. Unites States,* 55 Fed.Cl. 223 (2003); *Franklin F.S.B. v. United States,* 55 Fed.Cl. 108 (2003). An expectancy interest is defined by the Restatement (Second) of Contracts (1981) as an "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a). Damages based on an expectancy interest are measured by (a) "the loss in value to [the injured party] of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that [the injured party] has avoided by not having to perform." Restatement (Second) of Contracts § 347. "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (citing Restatement (Second) of Contracts §§ 347, 351, 352 (1981)).

■ A second threshold issue that the Court must resolve is whether the breach caused the exchange offer, and whether multiple causes for the exchange destroyed causation or otherwise preclude summary judgment on the issue of whether Citizens may pursue its claims for the costs of capital replacement. Citizens can only recover the costs associated with the replacement of its capital cushion if the costs are related to the breach. The answer to this legal question depends on the standard used to determine if there was a causal link between the breach and the exchange.

The breaching provisions of FIRREA disallowed the counting of supervisory goodwill and capital credits toward all of Citizens' regulatory capital requirements. Citizens had a substantial balance of regulatory capital that was eliminated by FIRREA. Plaintiff's Appendix, (hereinafter "Pl.App." Vol-

ume I at 329–32, 34, 37 (filed September 16, 2002)). The non-breaching provisions of FIRREA likewise had a negative effect because it removed subordinated debt as a component of core and tangible capital for purposes of meeting regulatory requirements.

Plaintiffs argue that the Court must decide whether the breaching provisions of FIRREA were a "substantial factor" in Citizens incurring costs related to the exchange. *See Bluebonnet Savings Bank, F.S.B.,* 266 F.3d at 1356 (Fed.Cir.2001) ("Causation is a question of fact reviewed under the clear error standard ... The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs ...."). The Government suggests a more stringent standard is appropriate. It relies on *Myerle v. United States,* 33 Ct.Cl. 1, 27, 1800 WL 2024 (1897). Def.'s Br. at 45–7 (filed May 2, 2001). In *Myerle,* the Court of Claims held:

We hold that the plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. What those items are is somewhat difficult to determine. For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly or even probably. The damage must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events ... There must not be two steps between the cause and damage.

While issues of causation and foreseeability are questions of fact, the correct standard in which to evaluate them is a question of law. *Bluebonnet,* 266 F.3d at 1355–56 (Fed.Cir. 2001). This Court applied a less stringent "substantial factor" standard in *Energy Capital Corp. v. United States,* 47 Fed.Cl. 382, 395 (2000). This Court stated "[b]ecause often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate

that 'the defendant's breach was a 'substantial factor' in causing the injury.' " *Id. (citing California Federal Bank v. United States*, 43 Fed.Cl. 445, 451 (1999)).[7] The Federal Circuit looked at the Court's analysis with respect to causation and the award of lost profits and left it undisturbed. *Energy Capital*, 302 F.3d 1314, 1328–29 (Fed.Cir. 2002). Hence, other judges on this Court have followed the substantial factor test in determining whether the breach caused the damage in the *Winstar*-context. *See LaSalle*, 45 Fed.Cl. at 97 (1999). In *LaSalle*, Judge Bruggink awarded wounded bank damages using the substantial factor test. *Id.* ("There is sufficient evidence to establish that FIRREA was at least a substantial factor in plaintiff's increased costs. We find that plaintiff has demonstrated that it incurred increased premiums of $350,000 due to FIRREA"). The Federal Circuit did not disturb this award on appeal. Judge Smith similarly assessed plaintiff's request for wounded bank damages based on the substantial factor test. *Glendale Federal Bank, FSB v. United States*, 43 Fed.Cl. 390, 399 (1999). Likewise, in *Coast Federal Bank, F.S.B. v. United States*, 48 Fed.Cl. 402, 434–35 (2000), plaintiff argued that it need only show that the Government's breach was a "substantial" causal factor, not the "sole" cause for its wounded bank damages. The Court agreed that this was the appropriate standard. *Id.* at n. 29. The Federal Circuit did not address this issue on appeal. Most recently, Judge Baskir, relying on *Bluebonnet*, reviewed the standard for causation in the context of expectancy damage claims and concluded that the Federal Circuit requires that the trial court apply a "substantial factor" standard. *Southern California Sav. & Loan Assoc. v. United States*, 57 Fed.Cl. 598, 622 (2003) ("The Federal Circuit has further held that the standard for causation is that the breach must be a 'substantial factor' in the damages, not the 'but for' cause of the plaintiff's harm.")

The "substantial factor" standard has been reviewed with approval by the Federal Circuit in both *Bluebonnet* and *Energy Capital* even though *Myerle* has not been explicitly overruled. Because the Federal Circuit has accepted this standard, it is consistent with this Court's analysis in *Energy Capital*, and because the standard has been adopted in numerous *Winstar*-related cases before other judges on the Court, this Court concludes that it is the appropriate standard to be applied in the present case. As a result, the Court finds that Plaintiffs may proceed to attempt to establish that the exchange offer was caused by the breaching provisions of FIRREA.

Defendant argues that the Court cannot properly conclude on summary judgment that the exchange offers were in response to the breach because there have been conflicting opinions from Plaintiffs' expert and certain fact witnesses, who have maintained that the exchange was in response to the non-breaching provisions of FIRREA, which eliminated the practice of counting subordinated debt toward regulatory capital. Therefore, the Defendant argues that this issue must be resolved at trial. The Court disagrees. Because Plaintiffs need only show that the breach is a "substantial factor" for their harm, the fact that there may have been multiple causes for the exchange is immaterial.

Neither party disputes that after the enactment of FIRREA, the 1990 and 1991 exchange offer allowed Citizens to increase its tangible and core capital requirements by $62 million and $3.7 million respectively. Although Charles Stuzin, Citizens' Chairman, testified that Citizens never replaced the lost goodwill through the exchange offer, he has attested that the exchange offer was done to recover from FIRREA's impact because it was so "punitive." Pl.'s Reply. Brief at 25 (citing testimony of Charles Stuzin). Citi-

7. Note that in *California Federal Bank* on remand, Judge Hodges applied the more stringent standard set forth in *Myerle*. Judge Hodges noted that this Court in *Energy Capital* suggested that *Myerle* was overruled and "supplanted by a less strict test of whether defendant's breach was a 'substantial factor,' in causing the injury," which was "apparently well-regarded by the Federal Circuit." *California Federal Bank*, 54 Fed. Cl. at 713 n. 18. Judge Hodges declined to apply the substantial factor test because plaintiff agreed that damages must flow "naturally and inevitably" from the breach. *Id.*

zens' Chief Financial Officer answered "not really" to the question whether Citizens Federal ever replaced its supervisory goodwill and capital credit, but he explained that "to try to isolate the actions that we took in selling the preferred stock as replacement for one item or another is somewhat difficult ... we certainly didn't do anything to replace 100 percent of supervisory goodwill and the lost capital credit." Def.'s Opp. to Pl.'s Mot. Par. Summ. J & Cross–Mot. Par. Summ. J. at 56, 121–22. Citizens' Chief Financial Officer explained that "the major reason would be just the cost of capital would have been very, very, high to do so. Here was 100 plus million dollar's worth of regulatory capital that carried no direct cost to it. And to replace it we would incur certainly a direct cost to do so. There is only so much of that we could absorb." *Id.* at 122. Defendant also points out that Professor James, Plaintiffs' expert, also opines that Citizens chose to shrink in response to the breach and that the exchange was due to the non-breaching provisions of FIRREA. Defendant's Appendix (filed October 22, 2002) ("Def.App.2") at 103–112. Notably, however, in 2001, the Government criticized Dr. James' report and argued that "all of the contemporaneous evidence demonstrates that the exchange offers were, in part, to satisfy the fully phased in capital requirements and to mitigate the effect of the loss of goodwill and capital credit." Def.'s Mot. Summ. J. on Damages at 59. In 2001, Defendant further argued that cost of replacement methodology is the appropriate manner in which to value Plaintiffs' damages.

The Court agrees with the Government's first impression and finds that the exchange was due in part to mitigate the effects of lost goodwill and capital credit. Statements in the record that attribute the exchange to the non-breaching provisions of FIRREA do not support the Government's contention that the exchange offer was solely in response to the non-breaching provisions of FIRREA. The parties do not dispute that the exchange

offer allowed Citizens to meet its fully phased-in capital requirements, which it would not have otherwise met. Neither party disputes that Citizens suffered a $13 million shortfall before the exchange and that this capital-raising activity made Citizens a more financially sound institution. Thus, the Court finds that multiple causes for the exchange are immaterial, that they do not destroy causation, and that the breach was a substantial factor for bringing about the exchange offer.

### 1. Cost of Replacement Capital is a Good Measure of Expectancy Damages in the Winstar–Context

As stated, the cost of capital replacement is a good measure of a *Winstar* plaintiff's expectancy interest. The Federal Circuit looked favorably on Judge Bruggink's analysis stating that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." *LaSalle,* 317 F.3d at 1374 (Fed.Cir. 2003). This measure of damages has to be viewed in light of the costs and benefits of recapitalization. Defendant argues that Citizens is not entitled to the costs associated with the replacement of its capital cushion because Citizens did not need to, nor did it have to, raise capital. Rather Citizens could shrink its capital cushion, thereby incurring no transaction costs and also mitigating the breach. To the contrary, Citizens could have responded to the breach either by raising capital or shrinking its cushion. Replacement costs have been awarded when affected thrifts were deemed out of compliance with FIRREA's new criteria for capital requirements, having no cushion (*LaSalle* ), as well as when FIRREA did not cause the thrift to fall out of compliance (*California Federal* ).[8] *See LaSalle* ("Talman could not meet FIR-

---

8. In *California Federal* (*"Cal.Fed."* ), the cost of replacement capital was limited to floatation costs, including fees for underwriters and lawyers. In *Cal. Fed.*, a series of stock offerings, including a convertible preferred stock offering and a rights offering, allowed Cal. Fed. to replace *all of its supervisory goodwill.* The Court

found any amount greater than the floatation costs would be more than necessary to make plaintiff whole. *California Federal Bank, FSB, v. United States,* 43 Fed.Cl. 445, 460 (1999), *aff'd in relevant part,* 245 F.3d 1342, 1350 (Fed.Cir. 2001).

REA's new criteria, and faced the prospect of imminent receivership unless an acceptable capital compliance plan could be devised ...."). A recent *Winstar*-related case dealing with the cost of replacement capital, *Home Savings of America, FSB v. United States,* 57 Fed.Cl. 694 (2003), rejected the notion that the acquiring bank did not need to replace supervisory goodwill or otherwise was not injured by its loss because the bank retained regulatory capital in excess of minimum standards. The Court held in part that "even if it is true that Home Savings' regulatory capital in 1988 was greater than the amount minimally necessary to maintain its mandatory core capital, and even if it is true that the cushion shrank, this does not prove that Home Savings was not injured by the loss of supervisory goodwill." *Home Savings of America,* 57 Fed.Cl. at 721 (2003). The Court reasoned that the bank was entitled to rely on its target capital levels that it set for itself post-FIRREA and manage capital levels conservatively, if it determined that that strategy was best for the bank. *Id.; see also Bank United of Texas v. United States,* 50 Fed.Cl. 645, 665 (2001) (awarding costs of raising capital when Bank United was not out of capital compliance, although it was operating at a "dangerously low" level at the time of the mitigation transaction.). In *Bank United,* the thrift was awarded the costs of raising capital, even when the money recovered ultimately went to replace its capital cushion. The Court finds similarly in the present case. Citizens is entitled to the costs associated with the replacement of its supervisory goodwill and capital credit even though it maintained a capital cushion. Merely because Citizens maintained a cushion in excess of its mandatory capital requirements does not mean that Citizens' capital position was not compromised by the loss of goodwill and capital credits and therefore ultimately injured by their loss. For example, there is evidence in the record that the regulators asked Citizens to replace some of its cushion in order to be a self-sufficient institution.

*Home Savings* is significant for another reason. Judge Bruggink resolved the legal issue of whether Citizens is legally barred from recovering anything other than transaction costs in calculating the cost of replacement capital. Although both parties agree that mitigation damages are intended to place Plaintiff in as good a position as it would have been if Defendant had fully performed, Defendant argues that as a matter of law, Plaintiff is only entitled to the transaction costs associated with their capital-raising efforts (as awarded in *California Federal Bank*). Floatation costs, or transaction costs, associated with the cost of replacement capital have been awarded as damages, *see, e.g., California Federal Bank,* 245 F.3d at 1342 (Fed.Cir.2001), while inflated hypothetical costs of capital have not. *See, e.g., Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 697 (Fed.Cl.2002) (damage was neither caused nor increased by mitigation costs, thus there was no need to award hypothetical mitigation costs as a measure of damages). Although Citizens should be able to recover the transaction costs associated with its ability to replace its supervisory goodwill and capital credit, Citizens asks this Court to consider not only its transaction costs, but also the negative tax consequences it suffered as a result of the exchange. In *Home Savings of America,* Judge Bruggink examined the ability of Plaintiff to seek to recover costs of replacement capital in light of the cases evaluating a claim for the cost of replacement capital, such as, *Bank United,* 50 Fed.Cl. at 654–55 (rejecting a hypothetical replacement model); *California Federal Bank v. United States,* 43 Fed.Cl. at 461 (finding supporting expert not credible); *Glendale Federal Bank v. United States,* 43 Fed.Cl. 390, 398 (1999) (replacement costs rejected for lack of proof), rev'd in part, aff'd in part, 239 F.3d 1374 (Fed.Cir.2001); and *LaSalle,* 45 Fed.Cl. at 111 (1999) (rejecting purely hypothetical model that was a more costly alternative), *rev'd in part, aff'd in part,* 317 F.3d 1363 (Fed.Cir.2003). But none of the above-cited cases found that costs in addition to transaction costs were legally barred. Rather, the claims for cost of replacement capital were rejected when they were not based on the *actual costs of replacement.* Thus, the Court rejected Defendant's assertion that the Court limit plaintiff's recovery to transaction costs as a matter of

law. *Home Savings of America,* 57 Fed.Cl. at 708.

Judge Bruggink further held that his interpretation was consistent with the Federal Circuit's recent decision in *LaSalle.* There the Federal Circuit held in relevant part that plaintiff's "actual experience" raising capital could be used by the trial court to determine cost of capital. *LaSalle,* 317 F.3d at 1375 (Fed.Cir.2003); *see also Home Savings of America v. United States,* 57 Fed.Cl. 694 (2003). The Federal Circuit quoted with approval that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." *LaSalle,* 317 F.3d at 1374 (Fed.Cir.2003). Relying on the Federal Circuit guidance in *LaSalle,* Judge Bruggink awarded cost of replacement in Home Savings because the costs were based on an actual series of capital raising transactions. *Home Savings of America,* 57 Fed.Cl. at 702 (2003).

In the present case, Citizens' costs are based on actual costs associated with the exchange. Citizens' costs are unlike the inflated hypothetical costs of replacement rejected in other *Winstar*-related cases. Hypothetical costs of capital replacement, which were actually more costly than other available means of mitigation, have not been awarded. *See, e.g., Columbia First Bank,* 54 Fed.Cl. 693, 697; *Bank United,* 50 Fed.Cl. at 654–56. This is so because hypothetical costs of capital replacement do not reflect the *actual costs* that the thrifts incurred. *See e.g., Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223, 243 (2003) (citing *Glendale Federal Bank v. United States,* 43 Fed.Cl. 390, 398 (1999), *affirmed in part, vacated in part, and remanded,* 239 F.3d 1374; *California Federal Bank v. United States,* 43 Fed.Cl. at 461 (1999), *affirmed in part, vacated in part, and remanded,* 245 F.3d 1342; *Bank United,* 50 Fed.Cl. at 654–56, 665; *Franklin F.S.B. v. United States,* 55 Fed.Cl. 108, 137 (2003)). "[T]he Court of Federal Claims has soundly rejected theoretical preferred stock models for calculating

the cost of replacing lost goodwill with equity capital which yielded figures far in excess of the capital actually raised by a surviving thrift." *Franklin,* 55 Fed.Cl. at 138. In the present case, the amount of damages Citizens seeks is not only based on its actual costs of replacement, but is also commensurate with the amount of capital it needed to raise to be in compliance with all fully phased-in regulatory requirements. It is undisputed that Citizens suffered a $13.24 million shortfall absent the exchange and that it claims that it incurred costs in total that are less than that amount. Plaintiffs state that total reduction in after-tax cash flow for 1991 through 1995 is $7.337 million plus $1.6 million in transaction costs.

Defendant largely relies on *Bank United,* which recognized that a reduction in capital ratio, and resultant reduction in borrowing capacity, did not result in direct and immediate harm unless plaintiffs would have "actually used the leverage capacity by borrowing, reinvesting and achieving a positive rate spread." *Bank United,* 50 Fed.Cl. at 655. Thus, Defendant argues that Citizens is not entitled to replace its cushion unless it actually required the money to leverage. The Court finds this argument unpersuasive. In coming to this finding, the *Bank United* Court was addressing a claim for lost profits, a different breed of expectancy damages. The trial court found that a reduction in the amount necessary to leverage did not immediately and directly result in lost profits. The Court found no profits would have been lost "unless and until Bank United would have—but was unable to as a result of the lost leverage capacity—actually used the leverage capacity by borrowing, reinvesting and achieving a positive rate spread." *Bank United,* 50 Fed.Cl. at 655. "The value of leverage is the potential for profits." *Id.* Although the trial court recognized the potential for loss when a bank loses leverage capacity, the Court did not find the reduction caused any immediate harm to "tangible assets." *Id.* Significantly, the Court distinguished the costs of mitigation used to infuse capital. The Court stated,

"[A]t the time of FIRREA's impacts, plaintiffs became entitled to the cost of restoring the borrowing capacity (capital ratio)

eliminated by FIRREA in a way that would allow Bank United to pursue its intended growth and profit making plans. In a case of this nature, such damages are the same as the costs of mitigation. This is the 'make whole' remedy to which plaintiffs were surely entitled."

*Id.* The Court did indeed award these mitigation costs, including increased interest payments that Judge Turner, who presided in Bank United, believed plaintiffs would not have incurred absent the breach. Moreover, the trial court would have awarded more costs in connection with "mitigation infusions of capital," but no evidence was presented in that regard. *Id.* Citizens correctly point out that *Bank United* was not out of capital compliance at the time of its mitigation efforts. Pl.'s Notice of Clarification at 2 (filed March 10, 2003).

Moreover, Plaintiffs point out that the cost of the exchange operated at least cost to Defendant. Citizens recovered from FIRREA by shrinking its asset base and allegedly offering the exchange of subordinated debt to preferred stock. Calculating in the tax costs, this is roughly $9 million, whereas the cost of the shrink according to Professor James is approximately $46 million in lost earnings between the years of 1990–1995. Oral Argument Transcript ("Tr.") at 23–24 (March 6, 2003); James Rpt., Pl.'s App. 1 at 248–249. Based on this amount of foregone earnings, Professor James's model concludes that Citizens lost $84 million on its sale to NationsBank, a number they would plan to present at trial. *Citizens Federal Bank,* 52 Fed.Cl. at 563.

In sum, the Court concludes that as a matter of law, Citizens is entitled to prove its actual costs associated with its mitigation efforts.

### 2. Causation and Foreseeability Related to the Tax Consequences of the Exchange

█ Citizens asks for the actual costs associated with two capital-raising activities whereby Citizens raised its capital levels by converting subordinated debt to preferred stock in 1990 and 1991. Citizens induced its note holders to make the exchange. The face amount of the dividend payments were equivalent to the required payments on subordinated debt. Pl.'s Amended Mot. for Partial S.J. at 8. Citizens contends that the ramifications of the exchange are as follows: Citizens incurred approximately $1.6 million in costs relating to legal, accounting and other miscellaneous expenses; the exchange had a negative impact on Citizens' after-tax cash flow because payments on subordinated debt are tax deductible and come out of pre-tax earnings, while payments on preferred stock are not, and come from after-tax earnings. Plaintiffs state that total reduction in after-tax cash flow for 1991 through 1995 is $7.337 million. Pl.'s Amended Mot. for Partial S.J. at 21. Plaintiffs say that when this amount is grossed-up at today's federal corporate tax rate, the amount is $11.288 million. *Id.* Whether a gross-up of the award is appropriate will be discussed below. While Plaintiffs will have to support the accuracy of their calculation with an expert report, and the Government will have an opportunity to respond to Plaintiffs' analysis, the Court finds strong evidence in the record that Plaintiffs will meet their burden of proof with respect to causation, foreseeability and certainty. These issues as a matter of law do not prevent Plaintiffs from going forward with their claim for the cost of replacement capital.

"Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor and proved with reasonable certainty." *Bluebonnet Savings Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355–56 (Fed.Cir.2001). Foreseeability is a question of fact. "The party in breach need not have made a 'tacit agreement' to be liable for the loss. Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee." Restatement (Second) of Contracts § 351. Defendant challenges the foreseeability of the tax consequences as a measure of mitigation damages, and in addition it argues that the gross-up of the whole award is not foreseeable, which will be discussed below. Def.'s Br. at 26.

First, Plaintiffs' argument supports the proposition that the tax consequences associated with the cost of replacing supervisory goodwill are foreseeable. Plaintiffs point out that there is an economic cost of raising equity in order to comply with FIRREA, and the tax consequences are part of that cost. Plaintiffs argue persuasively that "payments on equity dividends are always paid out of after-tax dollars, and so it was foreseeable and knowable and a direct consequence of the fact of having to raise capital in the form of equity that there would be an economic cost associated with this." Tr. at 5–6. Defendant says that Citizens had a third option, it could have done nothing and operated at a reduced capital level. It is undisputed that the breach forced Citizens to maintain compliance with heightened regulatory requirements without the benefit of supervisory goodwill or capital credit. The Government's "do-nothing" defense, as Plaintiffs call it, is incorrect as a matter of law. Citizens had a duty to mitigate its damages with reasonable efforts. Restatement (Second) of Contracts § 350, *see also Robinson v. United States*, 305 F.3d 1330, 1333 (Fed.Cir.2002) (stating the standard set forth in the Restatement is the correct legal standard). In *Cal. Fed.*, 245 F.3d at 1350, the Federal Circuit recognized that a *Winstar* plaintiff could shrink or raise capital. Because the exchange offers only increased Citizens regulatory capital-in the parties' calculations, by approximately $65.7 million ($62 million in 1990 and $3.7 million in 1991), it may have done both. Generally, tax consequences have been awarded as an element of damages when they are reasonably foreseeable and flow from the breach. *See e.g., Alexsey v. Kelly*, 205 A.D.2d 650, 614 N.Y.S.2d 736 (1994) (finding state and federal income tax expenses natural and foreseeable consequences of defendant's breach); *Beggs v. Dougherty Overseas, Inc.*, 287 F.2d 80 (2d Cir.1961) (tax benefits accruing from foreign employment were contemplated by the parties and foreseeable, and thus an element of damages); *W.H. Walker v. Signal Companies, Inc.*, 84 Cal.App.3d 982, 149 Cal.Rptr. 119 (1978) (awarded damages based in part on lost tax benefits due to late completion of a home).

Moreover, the Government's "do nothing" argument appears foreclosed by the fact that the regulators found it "essential" that Citizens replace its goodwill. A March 1990 FDIC exam report indicates that "a program for replacement of this portion [core and risked-based capital] of the institutions [sic] capital base is essential for it to maintain capital ratios at regulatory levels." Pl.'s App., Volume II, at 521.

True, costs that are too remote from the breach will not be compensated. Nevertheless, the tax consequences here are similar to other costs that have been found to be foreseeable and caused by the breach. For example, in *Bluebonnet*, the Federal Circuit found that increased financing costs were "foreseeable under the circumstances" *Bluebonnet*, 266 F.3d at 1356 (Fed.Cir.2001). In *Bluebonnet*, the Federal Circuit reasoned that, based on the compounding effects of FIRREA, "it is foreseeable that [Bluebonnet] would have been forced to seek even more capital to meet the heightened regulatory requirements." *Id.* The Federal Circuit found no error in the Court's factual finding that it was also foreseeable that the heightened regulatory requirements and risk of seizure due to failure to meet those requirements would increase the risk in investing in the bank and increase the cost of financing. In the present case, Citizens was in a similarly vulnerable position due to heightened regulatory requirements and the huge loss of goodwill and capital credit. The Court finds no dispute on this point in the record. The Government concedes that as of December 31, 1989, Citizens suffered a $13.24 million shortfall in fully phased-in core capital requirements. Although Citizens did not contract for the counting of subordinated debt toward capital requirements, the Court, as in *Bluebonnet*, concludes it was foreseeable at the time of the contract that Citizens would have to replace the capital credit and goodwill in order to continue to be a self-sufficient institution. The Government further concedes that the American acquisition gave an $86 million capital credit and $17 million in supervisory goodwill, which before FIRREA could be counted toward Citizens' regulatory requirements. The Equitable acquisition resulted in about $35.9 million in supervisory

goodwill. Furthermore, Plaintiffs point to evidence that they bargained to maintain their capital cushion. Testimony by Citizens' Chief negotiator attests that Citizens negotiated to maintain its capital level at "something over 8%." Pl.'s App. at 152.

Second, Defendant also challenges whether the tax consequences of the exchange were caused by the breach. It argues that the tax consequences are not caused by the breach because they are too remote and consequential. Defendant again relies on *Myerle v. United States*, 33 Ct.Cl. 1, 1800 WL 2024 (1897). It says that the chain of events leading up to the breach include: the phase-out of goodwill and capital credit, the exchange of preferred stock for subordinated debt, the decision to declare and pay dividends, the obligation to pay taxes, and the hypothetical deduction of interest that would have been paid on the subordinated notes for taxes paid in those years. Mainly, it relies on the fact that as dividend payments are discretionary and involve Citizens' decision to pay, causation is destroyed. Defendant argues that these dividend payments are not the very subject of the contract. *LaSalle*, discredits this argument because it recognizes that payments on the return on dividends are a *cost* of capital to the bank and those costs may be attributable to the breach as long as they reflect the actual experience that dividends were paid out and the benefits of mitigation are accounted for. *LaSalle*, 317 F.3d at 1375. Plaintiffs' supplemental brief addressing *LaSalle*, argues persuasively that the focus of the inquiry with regard to mitigation damages is "making the nonbreaching party whole by quantifying the costs incurred as a consequence of the breach." Plaintiff's Supplemental Brief Concerning *LaSalle Talman v. United States* at 4 (filed February 21, 2003) (hereinafter "Pl.'s Supp. Br.").[9] Plaintiffs argue that "the manner in which the nonbreaching party raises the funds necessary to cover such costs has no bearing upon the underlying inquiry." Pl.'s Supp. Br. at 4.

Finally, for the reasons already stated, the tax costs associated with the exchange offer appear to be reasonably certain because they reflect the actual costs incurred from the 1990 and 1991 exchange. Therefore, the Court rejects Defendants' arguments that Citizens is legally barred from recovery of its tax-related costs associated with the exchange offer.

Defendant's second related argument that Plaintiffs' damages calculation is based on improper consideration of post-breach evidence will be discussed below.

### D. Tax Gross–Up of a Potential Award

Citizens asks that a tax gross-up of its potential award be included in the calculation of damages. Plaintiffs calculate that total reduction in after-tax cash flow for 1991 through 1995 is $7.337 million. Plaintiffs say that when this amount is grossed-up at today's federal corporate tax rate, the amount is $11.288 million.[10] Citizens argues that the gross-up is necessary to make Plaintiffs whole. Plaintiffs argue that the tax adjustment is necessary because unlike other mitigation costs, such as transaction costs (where Plaintiffs seek no adjustment), the tax costs of the exchange offer could not be deducted, since the exchange resulted in a loss of a tax deduction in connection with subordinated debt. Another example cited by Plaintiffs is lost profits where the foregone profits would have been taxed when realized; taxing them later in the context of a damages award would not result in a windfall to the plaintiff. Pl.'s Reply at 19.

▮ Courts generally do not gross-up damage awards to take into account the plaintiff's tax liability on the award unless a plaintiff can show with reasonable certainty that the gross-up is necessary to make plaintiff whole, the award will be subject to taxation and, for purposes of calculating the gross-up, that the award will be taxed at a certain rate.[11] *See Oddi v. Ayco Corp.*, 947

---

9. Because issues similar to those in the present case were addressed by the Federal Circuit in *LaSalle,* the Court ordered supplemental briefing.

10. Plaintiffs contend that the proper calculation for the gross-up is 1 ÷ (1–tax rate). The corporate tax rate in 35%.

11. For example, in *LaSalle,* Judge Bruggink thought that the tax adjustment in Professor

F.2d 257 (7th Cir.1992) (gross-up awarded where monies would not have otherwise been taxed as income absent the breach); *Home Savings of America*, 57 Fed.Cl. 694, 729–30 (2003) (finding a gross-up appropriate in this *Winstar*-related case because it was necessary to make plaintiffs whole, and plaintiffs in that case proved with reasonable certainty that they would pay taxes on the award and the appropriate rate at which they would be taxed); *First Nationwide v. United States*, 56 Fed.Cl. 438, 449 (2003) (finding that the damages award to plaintiffs would be taxed and therefore should be grossed-up to give plaintiffs full restitution); *cf., Centex Corp. v. United States*, 55 Fed.Cl. 381, 389 (2003) (declining to gross-up an award when the money may not have been subject to taxation and a gross-up could result in a windfall to plaintiff). Where a tax adjustment is unsupported by the record it will not be awarded. For example, in *LaSalle*, a gross-up was rejected when plaintiff provided no case law supporting an upward adjustment; the adjustment required too many assumptions, such as whether any damages award would be taxable as income; and whether plaintiff's tax rate of 40% would remain constant through 2012. *LaSalle*, 45 Fed.Cl. at 110.

Plaintiffs in the present case rely on two cases supporting the proposition that they are entitled to a gross-up of their potential damages award: *Oddi v. Ayco Corp.*, 947 F.2d 257 (7th Cir.1992) and *Cavanagh v. United States*, 12 Cl.Ct. 715 (1987). In *Cavanagh*, the Bureau of Public Debt failed to redeem bonds tendered by plaintiff in payment of federal estate taxes, which was a breach of contract. The court reduced plaintiff's mitigation award due to a tax effect of the award that would have put plaintiff in a better position than it would have been in without the breach. 12 Cl.Ct. 715. Citizens contends that *Cavanagh* illustrates that tax consequences are taken into account when necessary to achieve the fair amount of expectancy damages. In *Oddi*, the Seventh Circuit grossed-up a damages award when plaintiff would have incurred an additional tax as a result of the breaching party's mistake (his financial advisor), and thus it was necessary to make plaintiff whole to gain the benefit of his bargain. Defendant contends that *Oddi* does not support Citizens because in that case the tax consequences were foreseeable and "solely" due to the financial advisor's mistake, whereas here, the tax consequences were not foreseeable nor a direct result of the breach. Defendant says the same is true in *Cavanagh*, where the tax consequences were taken into account because they were foreseeable and a direct result of the breach. Defendant points to numerous contingencies that would make the adjustment speculative, such as that Plaintiffs cannot demonstrate their level of future taxation, whether Citizens or beneficiaries of the litigation trust could shelter the award and whether they could be required to pay taxes on the award. Plaintiffs reply that Defendant, as it is the United States, knows whether the award will be taxed, and that the there is no speculation as to the tax rate because the relevant date for the gross-up calculation would be the time that payment is made by the Government.

Nevertheless, the speculative nature of the gross-up counsels against it in this case. Outside of the *Winstar* context, a gross-up has been routinely rejected in breach of contract cases because the gross-up is speculative. An interesting case is *Ehly v. Cady*, 212 Mont. 82, 687 P.2d 687, 695 (1984), where the court allowed plaintiff to recover damages for breach of contract based on lost tax savings that the court found were reasonably foreseeable, but the Court did not allow plaintiff to recover additional damages based on the taxes he would have to pay on the award. The Seventh Circuit, however, has declined to follow *Ehly* in finding that Illinois, unlike Montana, would allow plaintiff to recover additional damages for the tax on the award that plaintiff would not have incurred but for the breach. Nevertheless, the Seventh Circuit's approach is quite unusual. Generally courts have rejected the gross-up

---

James's model was unsupported. Plaintiff provided no case law supporting an upward adjustment, and the adjustment required too many assumptions, such as (1) whether any damages award would be taxable as income and (2) plaintiff's tax rate through 2012. *LaSalle*, 45 Fed.Cl. at 110 (1999).

of a damages award. *See e.g., McLaughlin v. Union–Leader Corp.,* 100 N.H. 367, 127 A.2d 269, 273 (1956) (declining to award excess tax liability on damages in a breach of employment contract action); *McGuire v. City of Jersey City,* 125 N.J. 310, 324–325, 593 A.2d 309 (1991) (declining to award damages based on foregone tax credits and finding that "[t]he availability of the credits depends on many conjectural variables, and the credits are thus too speculative to form a basis for recovery."); *Stopford v. Boonton Molding Co.,* 56 N.J. 169, 195, 265 A.2d 657 (1970) (declining to award damages based on income tax liability); *see also DePalma v. Westland Software House,* 225 Cal.App.3d 1534, 1544, 276 Cal.Rptr. 214 (1990) (finding the prediction of tax consequences complex and speculative). Moreover, the Seventh Circuit distinguished *Ehly* by noting that the defendants in that case were unsophisticated and did not foresee the additional tax implications of their actions, whereas the tax consequences in *Oddi, supra,* were found to be foreseeable and solely the result of defendant's mistake. *Oddi,* 947 F.2d at 267–68 (7th Cir.1992). In addition, the Seventh Circuit has said that "the party seeking an increase in an award to reflect tax effects bears the 'burden of presenting evidence that show he will be liable for the prescribed amount of taxes.' " *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 106 F.3d 1388, 1404 (7th Cir.1997) (quoting *Oddi,* 947 F.2d at 268).

In light of the record, the Court finds that in this case Plaintiffs are not entitled to gross-up their out-of-pocket damages because they cannot meet their burden with reasonable certainty. A tax gross-up is too speculative to be awarded because the Court does not know that the award will be taxed nor the rate at which it would be taxed. Defendant made this point during oral argument on this issue. The Government argued that even if it knew the rate at which the individuals who receive an award will be taxed, "we simply don't know that they will be subject to taxation." Tr. at 74. Defendant gave the example of Charles Stuzin, Citizens' Chairman, who could have capital losses that would shelter any of his income. Defendant correctly points out that this

would result in a windfall to Mr. Stuzin because he would not actually be taxed on the award. In *Home Savings,* in contrast, plaintiffs were able to establish the marginal rate at which they were taxed before and after their acquisition and were able to project the tax liability on any damages award based on the acquirer's marginal tax rate paid in previous years as well as estimates made for 2003 tax purposes. *Home Savings,* 57 Fed. Cl. 694, 730. Here, there are numerous uncertainties that counsel against a gross-up. The questionable tax liability of Mr. Stuzin is but one example. The Court is also uncertain with respect to whether beneficiaries of the litigation trust established for this matter could shelter the award and whether they could be required to pay taxes on the award. Plaintiffs here have not presented such evidence, illustrated by Defendant's example of Mr. Stuzin, who could receive a windfall from the gross-up.

### E. The Discounting of Potential Award

■ Plaintiffs were asked to address in their motion for partial summary judgment whether mitigation costs incurred prior to the date of judgment should be discounted back to the date of the breach and whether failure to discount would result in the award of pre-judgment interest. Expectancy damages on an ongoing contract are measured over the course of the contract. *See Energy Capital Corp. v. United States,* 302 F.3d 1314, 1330 (Fed.Cir.2002); *LaSalle,* 45 Fed. Cl. at 108–09. In contrast, future expectancy damages, such as anticipated lost profits, are to be discounted to the date of judgment. *Energy Capital,* 47 Fed.Cl. 382, 416 (2000), *aff'd in relevant part,* 302 F.3d at 1330 (2002) (citing *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 634 F.2d 557, 564 (1980)). The issue presented in the present case is whether past expectancy damages accrued on an ongoing contract are discounted back to the date of the breach. In the present case, Plaintiffs are not asking for future profits; rather, they are asking for costs already incurred. The Court finds that because Citizens is not asking for future costs, but only those already incurred, the award should not be discounted.

Citizens correctly states that the reason post-judgment damages are discounted is so that damages accrued after the date of judgment would not result in a windfall or "unjust enrichment" for plaintiffs. Citizens contends that the opposite is true for damages that accrue before judgment. In that case, Citizens argues that discounting would result in undercompensation because damages resulting before judgment are based upon costs that are already incurred.

Defendant distinguishes Plaintiffs' claimed cost of mitigation from the *lost profits* at stake in *Energy Capital.* The Government contends that the appropriate time to measure the cost of mitigation or "cover transaction" is at the *time of replacement.* Defendant argues that the Federal Circuit declined to opine whether discounting would be appropriate in cases where all of the claimed damages were incurred prior to the date of judgment.

Although the Federal Circuit did not expressly opine in *Energy Capital* that expectancy damages occurring prior to judgment should not be discounted, that guidance is implicit in the court's rationale. The court reasoned that to prevent unjust enrichment to plaintiff, future damages must be discounted because discounting converts future dollars to an equivalent amount in today's dollars. *Id.* Thus, plaintiff's argument that the damages accruing prior to date of judgment should not be discounted is the correct position. Moreover, expectancy damages occurring prior to judgment should not be discounted to the date of the breach, given that the Court measures expectancy damages throughout the course of the contract, rather than at the time of breach. *Id.*

■ Furthermore, failure to discount would not result in an award of prejudgment interest. In *Energy Capital,* the Federal Circuit explicitly said in the context of future lost profits, "[d]iscounting future lost profits to the date of judgment merely converts future dollars to an equivalent amount in present dollars at the date of judgment; it is not an award of prejudgment interest and does not violate sovereign immunity." *Id.* at 1330. Likewise, costs already incurred, as in the present case, will be awarded in present

dollars and would not result in a windfall to Plaintiff or in an award of prejudgment interest.

## F. The Role of Hindsight and After–the–Fact Evidence in Calculating the Costs of Mitigation

■ Defendant was asked to consider in its cross-motion whether hindsight and after-the-fact evidence may be considered in calculating the costs of mitigation. Defendant maintains that in the present case, damages should be measured at the time of the mitigating transaction or at the time of capital replacement. Citizens contends that it is appropriate for the Court to consider post-breach evidence when calculating damages because this Court, the Federal Circuit, and the Supreme Court have done so in the past. For example, the Federal Circuit's instruction for remand in *LaSalle,* told the Court to focus on the *actual* dividends paid, which would require the trial court to consider post-breach evidence. Citizens argues this instruction refutes the Government's position that post-breach evidence is not a legitimate basis for awarding mitigation damages. The Federal Circuit rejected a calculation of damages that did not "reflect the actual experience that the dividends were paid out of earnings . . . ." *LaSalle,* 317 F.3d at 1375 (Fed.Cir.2003). To support their position and refute Defendant's argument, Citizens also cites cases where the Supreme Court and the Court of Claims have considered evidence from a post-breach period when awarding expectancy damages. Pl.'s Reply at 12 (citing *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689, 698, 53 S.Ct. 736, 77 L.Ed. 1449 (1933) (patent damages); *Peck Iron & Metal Co. v. United States,* 221 Ct.Cl. 37, 603 F.2d 171, 175 (1979) (calculating damages for Government's breach of its contract to sell shipbreaker a 30,000 ton surplus aircraft carrier for scrapping the carrier); *Robinson v. United States,* 305 F.3d 1330 (Fed.Cir.2002) (involving the measure of damages after a purchaser of real property at auction breached its contract with the government to purchase the property and the Government failed to mitigate its damages when it failed to advertise or con-

sider the market conditions upon the buyer's breach)).

Several points are clear from the cases cited by Citizens. First, "complete certainty and mathematical precision is not necessary once the fact of damages has been established." Rather, courts make "the best approximation of damages based on the best available evidence." *See Peck Iron,* 221 Ct. Cl. 37, 603 F.2d 171 at 174 (1979). Second, Justice Cardozo's opinion in *Sinclair Refining Co.,* explains that "when there has been a substantial delay between a breach of contract and the time of trial, experience is then available to correct uncertain prophecy . . . ." Pl.'s Reply Br. at 12 (citing *Sinclair Refining Co.,* 289 U.S. at 698, 53 S.Ct. 736.) Nevertheless, when calculating damages for breach of contract, Justice Cardozo has counseled that we must not "charge the offender with elements of value nonexistent at the time of his offense." *Sinclair Refining Co.,* 289 U.S. at 698, 53 S.Ct. 736. Likewise, unforeseeable consequential damages resulting after the breach are not recoverable. *Peck Iron,* 603 F.2d at 176 (Ct.Cl.1979). And the non-breaching party *must* take reasonable measures to mitigate damages. *Robinson,* 305 F.3d at 1333 (Fed.Cir.2002). In assessing the reasonableness of the party's mitigation efforts, the Court may consider post-breach events. *See Robinson,* 305 F.3d at 1333–35 (Fed.Cir.2002) (analyzing the effect of the Government's failure to consider the market conditions in mitigating the breach).

Nonetheless, as Defendant points out "the time when performance should have taken place is the time as of which damages are measured." *See Reynolds v. United States,* 141 Ct.Cl. 211, 158 F.Supp. 719, 725 (1958). But this is not always the case. As explained in *Energy Capital, supra* Part II. E, the Federal Circuit recognized that while in many cases the appropriate date for the calculation of damages is the date of the breach, this is not so for anticipated profits or other expectancy damages. *Energy Capital,* 302 F.3d at 1330 (Fed.Cir.2002). The Federal Circuit said rather in cases where expectancy damages, "absent the breach would have accrued on an ongoing basis over the course of

the contact . . . damages are measured throughout the course of the contract." *Id.*

Citizens relies on *Energy Capital* and argues that damages should not be measured at the time of the breach when expectancy damages accrue over time. Plaintiffs argue that here Citizens' expectancy damages "accrued on ongoing basis over the course of the contract," and that this measure reflects that performance should have taken place over 25 years, the time specified in Citizens' contract. Pl.'s Reply at 13–14.

The issue comes down to whether the Court can assess the tax costs of the exchange over a five year period or whether those costs should be measured at the time of replacement, in which case there would be no cost other than transaction costs. The Court concludes that replacement costs should be measured over the course of the contract. The cost of replacement capital serves as a measure of *expectancy damages* in the *Winstar* context, *LaSalle,* 317 F.3d at 1363 (Fed.Cir.2003). Because expectancy damages are accrued on an ongoing basis over the course of the contract, damages should not be measured at the time of the breach. The Court may look to post-breach evidence in measuring Citizens' damages, particularly because the cost of replacement capital is measured by the actual costs incurred, not hypothetical ones. *Franklin,* 55 Fed.Cl. at 137; *Bank United,* 50 Fed.Cl. at 656, *LaSalle,* 45 Fed.Cl. at 112, *aff'd in relevant part,* 317 F.3d at 1374 (Fed.Cir.2003), *Fifth Third Bank,* 55 Fed.Cl. at 243. Moreover, the Federal Circuit directed the trial court to consider post-breach evidence when calculating the cost of capital replacement, namely the *actual dividends* paid out of earnings. *LaSalle,* 317 F.3d at 1375 (Fed. Cir.2003). Payment of dividends is a recognized cost of issuing preferred stock. *Fifth Third Bank of Western Ohio,* 55 Fed.Cl. at 240. Therefore, the Court finds that as a matter of law, it may consider post-breach evidence in determining the cost of the capital replacement.

## G. The Beneficial Effects of Mitigation

 Defendant contends that Citizens' damages model fails to account for any bene-

fits of the mitigating transaction-here the exchange offers. The Federal Circuit has counseled that "in determining damages the benefits of ... capital must be credited, as mitigation due to the replacement of goodwill with cash." *LaSalle*, 317 F.3d at 1375 (Fed. Cir.2003). The Court agrees that as a matter of law, the benefits of mitigation must be credited to Defendant, as it contends.

Furthermore, the burden is on Citizens to consider the beneficial effects of mitigation in its damages calculation. The Federal Circuit recently has said "the non-breaching party is not entitled, through an award of damages, to achieve a position superior to the one it would have reasonably have occupied had the breach not occurred." *LaSalle*, 317 F.3d at 1372 (Fed.Cir.2003). The *LaSalle* Court held that damages recoverable by the bank were mitigated by the beneficial effects of a mitigating transaction entered into in response to the breach. *Id.* at 1375. In *LaSalle*, the beneficial effects of another bank's acquisition of the predecessor thrift were to be credited as mitigation when the acquisition and recapitalization was a direct result of the government's breach. *Id.* at 1375. The reduction in loss through a substitute transaction (the acquisition) the Court found to be a mitigation of damages, and the benefits were properly credited. In contrast, other subsequent transactions "remote from the actions taken to achieve compliance with FIRREA" were not related to the recapitalization of the bank's lost goodwill. *Id.* at 1374. Therefore, "commercial activity remote from the actions taken to achieve compliance with FIRREA" should not be deducted from Citizens' costs.[12] *Id.*

Although Citizens must account for the benefits of capital replacement in their damages calculation, the Federal Circuit has said that "[t]he ascertainment of damages is not an exact science, and where the responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical pre-

cision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Bluebonnet*, 266 F.3d 1348, 1355 (Fed.Cir. 2001). Hence, the measure of the benefit need not be precise. The Court reaffirmed in *LaSalle*, "if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *LaSalle*, 317 F.3d at 1374 (Fed.Cir. 2003).

In the present case, there exists a factual dispute concerning the beneficial effects that the exchange offer may have provided Citizens. Defendant contends that the beneficial effects in the present case include an increase in Citizens' financing flexibility because of the lower yield on preferred stock,[13] a reduction in yield compared to what they would have been paying on their subordinated debt, and the flexibility to issue dividends on preferred stock whenever they chose to instead of making scheduled payments on subordinated debt. Citizens responds that they considered the potential beneficial effects of the exchange, and there were none. Citizens explains that the hypothetical benefits conferred from the exclusion of preferred stock dividends are irrelevant because the damages are calculated based upon actual dividend payments made compared to what would have been due on subordinate debt. Moreover, Plaintiffs say Citizens' preferred stock was held by individuals who reported all dividends as income. In addition, Plaintiffs argue that the better interest rates Citizens enjoyed conferred no real benefit because there is no evidence suggesting Citizens would not have been able to refinance its subordinated debt in order to take advantage of lower interest rates. Because of this factual dispute between the parties, the Court cannot determine the beneficial effects of mitigation, if any, until it considers expert opinion regarding the beneficial effects of the ex-

---

**12.** The Federal Circuit relied on the rule "articulated by Justice Holmes that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong ...." *LaSalle*, 317 F.3d at 1373.

**13.** Dr. Leftwich explains that because corporations can exclude most of the preferred stock dividends they receive from taxable income (30%), firms that purchase preferred stock often require lower return on the stock, which is a benefit to the issuer.

change offer. Causation is a question of fact, and presently there is a factual dispute between the parties concerning the benefits that flowed from the exchange. *See La-Salle,* 317 F.3d at 1374–75 (Fed.Cir.2003). Because the Court has already found that Citizens may proceed on its costs of replacement theory of recovery, the Court expects that any supplemental expert reports addressing this theory will account for the beneficial effects of the mitigating transaction on Citizens' financial condition. The amount of Citizens' damages is to be reduced by the benefit it received as long as the offsetting benefit can be traced to the breach.

## III. CONCLUSION

For the reasons stated, Plaintiffs' Motion for Partial Summary Judgment is GRANTED IN PART, AND DENIED IN PART. Defendant's Cross–Motion for Partial Summary Judgment is GRANTED IN PART, AND DENIED IN PART. Because the Court has found that Plaintiffs are entitled to prove its replacement costs associated with the exchange offer, the parties shall file a joint status report within 10 days of the filing of this opinion indicating how they would like to proceed on damages. Their report shall include three suggested dates for a status conference.